**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOSEPH A. PAKOOTAS, an individual
and enrolled member of the
Confederated Tribes of the
Colville Reservation; DONALD R.
MICHEL, an individual and enrolled
member of the Confederated
Tribes of the Coville Reservation;
STATE OF WASHINGTON,
                    *Plaintiffs-Appellees,*

            v.

TECK COMINCO METALS, LTD., a
Canadian corporation,
                    *Defendant-Appellant.*

No. 05-35153

D.C. No.
CV-04-00256-AAM

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Alan A. McDonald, Senior District Judge, Presiding

Argued and Submitted
December 5, 2005—Seattle, Washington

Filed July 3, 2006

Before: Ronald M. Gould and Marsha S. Berzon,
Circuit Judges, and William W Schwarzer,* District Judge.

Opinion by Judge Gould

---

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

## COUNSEL

Kevin M. Fong, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, California, for defendant-appellant Teck Cominco Metals, Ltd.

Paul J. Dayton and Daniel F. Johnson, Short Cressman & Burgess PLLC, Seattle, Washington, for plaintiffs-appellees Joseph A. Pakootas and Donald R. Michel.

Alexandra K. Smith, Assistant Attorney General, Olympia, Washington, for plaintiff/intervenor-appellee State of Washington.

Loren R. Dunn, Riddell Williams PS, Seattle, Washington, for amici Washington Environmental Council, Washington, Public Interest Research Group, and Citizens for a Clean Columbia.

Rex S. Heinke, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California, for amici Canadian Chamber of Commerce and the Mining Association of Canada.

Brian Hembacher, Deputy Attorney General, Los Angeles, California, for amici People of the State of California ex rel. Bill Lockyer, Attorney General for the State of California, and the States of Arizona, Idaho, Montana and Oregon.

Margaret K. Pfeiffer, Sullivan & Cromwell LLP, Washington, D.C., for amicus Government of Canada.

Carter G. Phillips, Sidley Austin Brown & Wood LLP, Washington, D.C., for amicus Chamber of Commerce of the United States of America.

Rob Roy Smith, Morisset Schlosser Jozwiak & McGaw, Seattle, Washington, for amicus Okanagan National Alliance in support of plaintiffs-appellees.

Catherine E. Stetson, Hogan & Hartson LLP, Washington, D.C., for amici National Mining Association and the National Association of Manufacturers.

Martin Wagner, Earthjustice, Oakland, California, for amici Sierra Club and Sierra Club of Canada.

Shannon D. Work, Funke & Work, Coeur d'Alene, Idaho, for amicus Spokane Tribe of Indians.

## OPINION

GOULD, Circuit Judge:

Joseph A. Pakootas and Donald R. Michel (collectively "Pakootas") filed suit to enforce a Unilateral Administrative Order (Order) issued by the United States Environmental Protection Agency (EPA) against Teck Cominco Metals, Ltd. (Teck), a Canadian corporation. The Order requires Teck to conduct a remedial investigation/feasibility study (RI/FS) in a portion of the Columbia River entirely within the United States, where hazardous substances disposed of by Teck have come to be located. We decide today whether a citizen suit based on Teck's alleged non-compliance with the Order is a domestic or an extraterritorial application of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675. Further, we address Teck's argument that it is not liable for having "arranged for disposal" of hazardous substances because it disposed of the hazardous substances itself, rather than arranging for disposal "by any other party or entity." § 9607(a)(3).[1] We hold that because CERCLA liability is triggered by an actual or threatened release of hazardous substances, and because a release of hazardous substances took place within the United States,

---

[1] Unless otherwise indicated, statutory citations herein are to Title 42 of the United States Code.

this suit involves a domestic application of CERCLA. Further, we reject Teck's contention that it is not liable under § 9607(a)(3) because it disposed of the hazardous substances itself.

# I

We consider an interlocutory appeal of the denial of Teck's motion to dismiss.[2] In August of 1999, the Colville Tribes petitioned the EPA under § 9605 to conduct an assessment of hazardous substance contamination in and along the Columbia River in northeastern Washington state. The EPA began the site assessment in October 1999, and found contamination that included "heavy metals such as arsenic, cadmium, copper, lead, mercury and zinc." In re Upper Columbia River Site, Docket No. CERCLA-10-2004-0018, at 2 (Unilateral Administrative Order for Remedial Investigation/Feasibility Study Dec. 11, 2003), *available at* http://yosemite.epa.gov/ R10/CLEANUP.NSF/UCR/Enforcement [hereinafter UAO]. The "EPA also observed the presence of slag, a by-product of the smelting furnaces, containing glassy ferrous granules and other metals, at beaches and other depositional areas at the Assessment Area." *Id.* at 2-3. The EPA completed its site assessment in March of 2003, and concluded that the Upper Columbia River Site (the Site)[3] was eligible for listing on the National Priorities List (NPL).[4]

---

[2]Because this appeal follows denial of a motion to dismiss, we take the facts as stated in the complaint as true and in the light most favorable to Pakootas. *See Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996).

[3]The "Upper Columbia River Site" includes "the areal extent of contamination in the United States associated with the Upper Columbia River, and all suitable areas in proximity to the contamination necessary for implementation of a response action." UAO at 2.

[4]The NPL "is a compilation of uncontrolled hazardous substances releases in the United States that are 'priorities' for long-term evaluation and response." 4 William H. Rodgers, Jr., *Environmental Law: Hazardous Wastes and Substances* § 8.7(C) (Supp. 2005). "Inclusion of a site or facility on the list requires no action, assigns no liability, and does not pass judgment on the owner or operator. . . . [T]he key consequence of being listed is that only NPL sites qualify for [Superfund]-financed remedial action." *Id.*

Teck owns and operates a lead-zinc smelter ("Trail Smelter") in Trail, British Columbia.[5] Between 1906 and 1995, Teck generated and disposed of hazardous materials, in both liquid and solid form, into the Columbia River. These wastes, known as "slag," include the heavy metals arsenic, cadmium, copper, mercury, lead, and zinc, as well as other unspecified hazardous materials. Before mid-1995, the Trail Smelter discharged up to 145,000 tons of slag annually into the Columbia River. Although the discharge took place within Canada, the EPA concluded that Teck

> has arranged for the disposal of its hazardous substances from the Trail Smelter into the Upper Columbia River by directly discharging up to 145,000 tonnes of slag annually prior to mid-1995. Effluent, such as slag, was discharged into the Columbia River through several outfalls at the Trail Smelter . . . . The slag was carried downstream in the passing river current and settled in slower flowing quiescent areas.[6]

*Id.* at 3. A significant amount of slag has accumulated and adversely affects the surface water, ground water, sediments,

---

[5]This is not the first time the Trail Smelter has been in a dispute over transboundary environmental pollution. *See generally* Michael J. Robinson-Dorn, *The Trail Smelter: Is What's Past Prologue? EPA Blazes a New Trail for CERCLA*, 14 N.Y.U. Envtl. L.J. 233, 241-53 (2006) (describing factual and procedural background of the Trail Smelter Arbitration, which concerned sulfur dioxide emissions from the Trail Smelter that migrated into the United States in the early twentieth century).

[6]The complaint alleges that the Trail Smelter discharged up to 145,000 tons of slag annually, but the EPA alleges that the Trail Smelter discharged up to 145,000 tonnes annually. A "ton" is equivalent to 2,000 pounds. A "tonne," or metric ton, is equivalent to 1,000 kilograms, or 2,205 pounds. Thus, 145,000 tonnes, each with 205 pounds more than an American "ton," is equivalent to about 160,000 tons. Either way, the Trail Smelter discharged a ton of slag in the colloquial sense, and the difference between the two figures is immaterial for our purposes. Because we take the facts as alleged by Pakootas, we use his figure of 145,000 tons.

and biological resources of the Upper Columbia River and Lake Roosevelt. Technical evidence shows that the Trail Smelter is the predominant source of contamination at the Site. The physical and chemical decay of slag is an ongoing process that releases arsenic, cadmium, copper, zinc, and lead into the environment, causing harm to human health and the environment.

After the EPA determined that the Site was eligible for listing on the NPL, it evaluated proposing the Site for placement on the NPL for the purpose of obtaining federal funding for evaluation and future cleanup. At that time Teck Cominco American, Inc. (TCAI)[7] approached the EPA and expressed a willingness to perform an independent, limited human health study if the EPA would delay proposing the Site for NPL listing. The EPA and TCAI entered into negotiations, which reached a stalemate when the parties could not agree on the scope and extent of the investigation that TCAI would perform. The EPA concluded that TCAI's proposed study would not provide the information necessary for the EPA to select an appropriate remedy for the contamination, and as a result the EPA issued the Order on December 11, 2003. The Order directed Teck to conduct a RI/FS[8] under CERCLA for the Site. To date Teck has not complied with the Order, and the EPA has not sought to enforce the Order.

Pakootas filed this action in federal district court under the citizen suit provision of CERCLA. § 9659(a)(1). Pakootas sought a declaration that Teck has violated the Order, injunc-

---

[7]TCAI is a wholly-owned American subsidiary of Teck.

[8]"The purpose of the remedial investigation/feasibility study (RI/FS) is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy. Developing and conducting an RI/FS generally includes the following activities: project scoping, data collection, risk assessment, treatability studies, and analysis of alternatives. The scope and timing of these activities should be tailored to the nature and complexity of the problem and the response alternatives being considered." 40 C.F.R. § 300.430(a)(2).

tive relief enforcing the Order against Teck, as well as penalties for non-compliance and recovery of costs and fees. Teck moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) for failure to state a cause of action under CERCLA and lack of subject matter jurisdiction, on the ground that the district court could not enforce the Order because it was based on activities carried out by Teck in Canada. Teck also moved to dismiss for lack of personal jurisdiction over Teck, a Canadian corporation with no presence in the United States. After Teck filed its motion to dismiss, the State of Washington moved to intervene as of right as a plaintiff in the action. The district court granted the motion to intervene, and considered Teck's pending motion to dismiss to apply to both Pakootas's complaint and the State of Washington's complaint-in-intervention.

The district court denied Teck's motion to dismiss. It held that because the case arises under CERCLA "there is a federal question which confers subject matter jurisdiction on this court." Because there was a federal question, and because Pakootas's claims were not insubstantial or frivolous, the district court held that dismissal under Federal Rule of Civil Procedure 12(b)(1) was inappropriate. The district court also held that "[t]he facts alleged in plaintiffs' complaints establish this court's specific, limited personal jurisdiction over the defendant."

Much of district court's order was devoted to analyzing Teck's argument that the suit involved an impermissible extraterritorial application of CERCLA, and thus whether dismissal for failure to state a claim under CERCLA was appropriate. The district court first acknowledged that "there is some question whether this case really involves an extraterritorial application of CERCLA." However, the district court assumed that the case involved an extraterritorial application of CERCLA, and considered whether extraterritorial application was permissible here.

In addressing the question of extraterritorial application, the district court acknowledged that "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States," but that it is "a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " (quoting *EEOC v. Arabian Am. Oil Co.* ("*Aramco*"), 499 U.S. 244, 248 (1991)). However, the district court concluded that the presumption against extraterritoriality was overcome here, because

> there is no doubt that CERCLA affirmatively expresses a clear intent by Congress to remedy 'domestic conditions' within the territorial jurisdiction of the U.S. That clear intent, combined with the well-established principle that the presumption [against extraterritoriality] is not applied where failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States, leads this court to conclude that extraterritorial application of CERCLA is appropriate in this case.

Further, the district court held that Teck was a "person" under the meaning of § 9601(21), and held that Teck's liability as a "generator" of hazardous waste and/or as an "arranger" of the disposal of hazardous waste could not be ruled out under § 9607(a)(3).[9]

---

[9]CERCLA defines an arranger as:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

§ 9607(a)(3).

The district court *sua sponte* certified its order for immediate appeal to us pursuant to 28 U.S.C. § 1292(b). Thereafter, Teck petitioned for permission to appeal, which we granted. While Teck's petition for permission to appeal was pending before us, the district court granted Teck's motion to stay further proceedings in the district court pending the outcome of this interlocutory appeal.[10]

On this appeal, Teck does not challenge the district court's determination that it had personal jurisdiction over Teck. And although Teck "disputes the conclusion" that the district court had subject matter jurisdiction to hear the case, it does not argue in its briefing that the district court was without subject matter jurisdiction. Rather, Teck argues that the district court should have dismissed Pakootas's complaint under Federal

---

[10]After this appeal was submitted for decision, Teck filed a request for us to take judicial notice of a settlement agreement between Teck and EPA, in which the EPA agreed to withdraw the Order that is the subject of this appeal. Neither Pakootas nor the State of Washington, who are the plaintiff and plaintiff-intervenor in this litigation, was a party to the settlement agreement. We take notice that the settlement between Teck and the EPA was reached, but we do not take notice of supplemental arguments urged by Teck relating to the agreement.

The parties are agreed that the settlement between Teck and the EPA does not render this action moot. Teck argues that this settlement renders moot Pakootas's claims for injunctive relief to enforce the Order and for declaratory relief that Teck is in violation of the Order, but that Pakootas's claims for civil penalties "for each day" that Teck violated the Order and for attorneys' fees, are not moot. Pakootas disputes that the settlement is self-executing and that it necessarily renders moot the claims for injunctive and declaratory relief. For purposes of this appeal, it is sufficient for us to note that Pakootas's claims for civil penalties and for attorneys' fees are not moot, and that we must proceed to decision of the appeal. On remand, we leave for the district court to decide in the first instance whether the claims for injunctive and declaratory relief are moot.

We further deny Teck's request for us to take judicial notice on this appeal of the following documents: (1) Order Granting Motions to Lift Stay, issued by the district court on October 25, 2005; (2) Plaintiffs' Amended Complaint, filed November 7, 2005; and (3) State of Washington's First Amended Complaint in Intervention, filed November 4, 2005.

Rule of Civil Procedure 12(b)(6) for two reasons. First, Teck argues that to apply CERCLA to Teck's activities in Canada would be an impermissible extraterritorial application of United States law. Second, Teck argues that it is not liable as a person who "arranged for disposal" of hazardous substances under § 9607(a)(3).

## II

We review de novo a district court's decision on a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Decker v. Advantage Fund Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). We review questions of law de novo. *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997).

## III

We begin by considering how this litigation fits within the CERCLA statutory framework. CERCLA sets forth a comprehensive scheme for the cleanup of hazardous waste sites, and imposes liability for cleanup costs on the parties responsible for the release or potential release of hazardous substances into the environment. *See Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir. 1997); *see also Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.,* 920 F.2d 1415, 1422 (8th Cir. 1990) (stating that "two . . . main purposes of CERCLA" are "prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party") (cited with approval in *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996)).

To ensure the prompt cleanup of hazardous waste sites, CERCLA gives four options to the EPA:[11] (1) the EPA can

---

[11]CERCLA vests this authority in the President, who in turn has delegated most of his functions and responsibilities to the EPA. *See* 40 C.F.R. § 300.100.

investigate and remediate hazardous waste sites itself under § 9604, and later seek to recover response costs from the potentially responsible parties (PRPs) under § 9607; (2) the EPA can initiate settlement negotiations with PRPs under § 9622; (3) the EPA can file suit in federal district court to compel the PRPs to abate the threat if there is an "imminent and substantial" threat to public health or welfare under § 9606(a); or (4) the EPA can issue orders directing the PRPs to clean up the site under § 9606(a). In this case, the EPA chose the fourth approach, and issued the Order to Teck under § 9606(a).

If a party receives an order and refuses to comply, enforcement options are available. *See generally Solid State Circuits, Inc. v. EPA*, 812 F.2d 383, 387 (8th Cir. 1987). First, the EPA may bring an action in federal district court to compel compliance, using the contempt powers of the district court as a potential sanction for non-compliance. § 9606(a). Second, the EPA may bring an action in federal district court seeking to impose fines of up to $25,000 for each day that the party fails to comply with the order. § 9606(b)(1). Third, the EPA may initiate cleanup of the facility itself under § 9604, and the party responsible for the pollution is potentially liable for the response and cleanup costs, plus treble damages. § 9607(c)(3).

Here, the EPA has not sought to enforce the Order through any of the mechanisms described above.[12] Rather, Pakootas initiated this suit in federal district court under § 9659, the citizen suit provision of CERCLA. Section 9659(a)(1) provides a cause of action for any person to commence a civil action "against any person . . . who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter." Section

---

[12]So far as we can tell from the record, the EPA did not take any formal action against Teck between issuing the Order on December 11, 2003 and settling with Teck on June 2, 2006.

9659(c) gives the district court the power "to order such action as may be necessary to correct the violation, and to impose any civil penalty provided for the violation." Further, § 9613(h)(2), the "timing of review" provision of CERCLA, grants federal courts jurisdiction to review an order issued under § 9606(a) when a party seeks to enforce the order.

Having placed this litigation in context, we turn to the merits.

## IV

Teck's primary argument is that, in absence of a clear statement by Congress that it intended CERCLA to apply extraterritorially, the presumption against extraterritorial application of United States law precludes CERCLA from applying to Teck in Canada. We need to address whether the presumption against extraterritoriality applies only if this case involves an extraterritorial application of CERCLA. So a threshold question is whether this case involves a domestic or extraterritorial application of CERCLA.

[1] Unlike other environmental laws such as the Clean Air Act, 42 U.S.C. §§ 7401-7671q, Clean Water Act, 33 U.S.C. §§ 1251-1387, and Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901-6992k, CERCLA is not a regulatory statute. Rather, CERCLA imposes liability for the cleanup of sites where there is a release or threatened release of hazardous substances into the environment. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 881 (9th Cir. 2001) (en banc) ("CERCLA holds a PRP liable for a disposal that 'releases or threatens to release' hazardous substances into the environment."). CERCLA liability attaches when three conditions are satisfied: (1) the site at which there is an actual or threatened release of hazardous substances is a "facility" under § 9601(9); (2) a "release" or "threatened release" of a hazardous substance from the facility has

occurred, § 9607(a)(4); and (3) the party is within one of the four classes of persons subject to liability under § 9607(a).[13]

**[2]** CERCLA defines the term "facility" as, in relevant part, "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." § 9601(9). The Order defines the "facility" in this case as the Site, which is described as the "extent of contamination *in the United States* associated with the Upper Columbia River." UAO at 2 (emphasis added); *see also* UAO at 5 ("The Upper Columbia River Site is a 'facility' as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).").[14] The

---

[13]There is a question whether the elements of CERCLA liability outlined in § 9607(a) are the same elements that the EPA must allege when issuing an order under § 9606(a). That is, § 9606(a) authorizes the EPA to issue "such orders as may be necessary to protect public health and welfare and the environment," but does not specify exactly what the EPA must allege before issuing such orders. Section 9606(b)(1) states that the EPA can seek fines for non-compliance in federal district court unless the person who refuses to comply with the order has "sufficient cause."

The Eighth Circuit, the only federal court of appeals to address the issue, has held that "sufficient cause" includes a defense that "the applicable provisions of CERCLA, EPA regulations and policy statements, and any formal or informal hearings or guidance the EPA may provide, give rise to an objectively reasonable belief in the invalidity or inapplicability of the clean-up order." *Solid State Circuits*, 812 F.2d at 392. We need not here decide whether a party that is not liable under § 9607(a) necessarily has "sufficient cause" to refuse to comply with an order issued under § 9606(a) because, as we hold below, Teck is potentially liable under § 9607(a).

However, one element of § 9607(a) liability does not apply here. In private cost recovery actions under § 9607(a), the claimant must incur response costs that are both "necessary" and "consistent with the national contingency plan." § 9607(a)(4). *See Carson Harbor Vill.,* 270 F.3d at 871-72. Because Pakootas filed a citizen suit under § 9659 rather than a private cost recovery action under § 9607(a), the requirement that a private party incur response costs before filing suit does not apply here.

[14]Because the EPA and Pakootas in seeking enforcement of the EPA's order do not characterize either the Trail Smelter or the Columbia River in Canada as a facility, we need not and do not reach whether these sites are facilities for purposes of CERCLA.

slag has "come to be located" at the Site, and the Site is thus a facility under § 9601(a). *See 3550 Stevens Creek Assocs. v. Barclays Bank of California*, 915 F.2d 1355, 1360 n.10 (9th Cir. 1990) ("[T]he term facility has been broadly construed by the courts, such that in order to show that an area is a facility, the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there." (internal quotation marks omitted)). The Order defines the facility as being entirely within the United States, and Teck does not argue that the Site is not a CERCLA facility. Because the CERCLA facility is within the United States, this case does not involve an extraterritorial application of CERCLA to a facility abroad. The theory of Pakootas's complaint, seeking to enforce the terms of the Order to a "facility" within the United States, does not invoke extraterritorial application of United States law precisely because this case involves a domestic facility.

[3] The second element of liability under CERCLA is that there must be a "release" or "threatened release" of a hazardous substance from the facility into the environment. *See* § 9607(a)(4). To determine if there is an actual or threatened release here, we consider the statutory definition of release. CERCLA defines a "release," with certain exceptions not relevant here, as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." § 9601(22).

Here, several events could potentially be characterized as releases. First, there is the discharge of waste from the Trail Smelter into the Columbia River in Canada. Second, there is the discharge or escape of the slag from Canada when the Columbia River enters the United States. And third, there is the leaching of heavy metals and other hazardous substances from the slag into the environment at the Site. Although each of these events can be characterized as a release, CERCLA liability does not attach unless the "release" is from a CERCLA facility.

**[4]** Here, as noted, the Order describes the facility as the Site; not the Trail Smelter in Canada or the Columbia River in Canada. Pakootas has alleged that the leaching of hazardous substances from the slag that is in the Site is a CERCLA release, and Teck has not argued that the slag's interaction with the water and sediment of the Upper Columbia River is not a release within the intendment of CERCLA. Our precedents establish that the passive migration of hazardous substances into the environment from where hazardous substances have come to be located is a release under CERCLA. *See A&W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1111 (9th Cir. 1998) (holding that wind blowing particles of hazardous substances from a pile of waste was a CERCLA release); *United States v. Chapman*, 146 F.3d 1166, 1170 (9th Cir. 1998) (affirming summary judgment where the Government presented evidence that corroding drums were leaking hazardous substances into the soil); *see also Coeur d'Alene Tribe v. Asarco, Inc.*, 280 F. Supp. 2d 1094, 1113 (D. Idaho 2003) ("Th[e] passive movement and migration of hazardous substances by mother nature (no human action assisting in the movement) is still a 'release' for purposes of CERCLA in this case."). We hold that the leaching of hazardous substances from the slag at the Site is a CERCLA release. That release—a release into the United States from a facility in the United States—is entirely domestic.

The third element of liability under CERCLA is that the party must be a "covered person" under § 9607(a). Teck argues that it is not a covered person under § 9607(a)(3) because it has not "arranged for disposal" of a hazardous substance "by any other party or entity" as required by § 9607(a)(3), because Teck disposed of the slag itself, and without the aid of another. Alternatively, Teck argues that if it is an arranger under § 9607(a)(3), then basing CERCLA liability on Teck arranging for disposal of slag in Canada is an impermissible extraterritorial application of CERCLA.

Assuming that Teck is an arranger under § 9607(a)(3),[15] we consider whether the fact that the act of arranging in Canada for disposal of the slag makes this an extraterritorial application of CERCLA. Teck argues that because it arranged in Canada for disposal, that is, the act of arranging took place in Canada even though the hazardous substances came to be located in the United States, it cannot be held liable under CERCLA without applying CERCLA extraterritorially.

**[5]** The text of § 9607(a)(3) applies to "any person" who arranged for the disposal of hazardous substances. The term "person" includes, *inter alia*, "an individual, firm, corporation, association, partnership, consortium, joint venture, [or] commercial entity." § 9601(21). On its face, this definition includes corporations such as Teck, although the definition does not indicate whether foreign corporations are covered. Teck argues that because the Supreme Court recently held that the term "any court" as used in 18 U.S.C. § 922(g)(1) does not include foreign courts, we should interpret the term "any person" so as not to include foreign corporations. *See Small v. United States*, 544 U.S. 385, 390-91 (2005).

The decision in *Small* was based in part on *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818), in which Chief Justice Marshall held for the Court that the words "any person or persons," as used in a statute prohibiting piracy on the high seas, "must not only be limited to cases within the jurisdiction of the state, but also to those objects to which the legislature intended to apply them." *Id.* at 631. The Court held that "any person or persons" did not include crimes "committed by a person on the high seas, on board of any ship or vessel belonging exclusively to subjects of a foreign state, on persons within a vessel belonging exclusively to subjects of a foreign state." *Id.* at 633-34. However, the Court held that

---

[15]We address in the next section Teck's contention that it is not a person for § 9607(a) purposes because it has not "arranged for disposal" of hazardous substances "by any other party or entity."

even though the statute did not specifically enumerate foreign parties as "persons," the statute did apply to punish piracy committed by foreign parties against vessels belonging to subjects of the United States. *See id.*

**[6]** *Palmer* relied upon two benchmarks for determining whether terms such as "any person" apply to foreign persons: (1) the state must have jurisdiction over the party, and (2) the legislature must intend for the term to apply. *See id.* at 631. Regarding jurisdiction, Teck argued in the district court that there was no personal jurisdiction over it. The district court held that there was personal jurisdiction, and Teck has not appealed that determination. Because a party can waive personal jurisdiction, we are not required to consider it *sua sponte. See Smith v. Idaho*, 392 F.3d 350, 355 n.3 (9th Cir. 2004) (citing the "longstanding rule that personal jurisdiction, in the traditional sense, can be waived and need not be addressed *sua sponte*"). Nevertheless, we agree with the district court that there is specific personal jurisdiction over Teck here.[16] Because there is specific personal jurisdiction over

---

[16]We do not decide whether there is general personal jurisdiction over Teck. Rather, we adopt the district court's conclusion that there is specific personal jurisdiction over Teck here, based on Washington State's long-arm statute, which applies to "the commission of a tortious act" within Washington, Wash. Rev. Code § 4.28.185, and our case law holding that "personal jurisdiction can be predicated on (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." *See Core-Vent Corp. v. Nobel Inds. AB*, 11 F.3d 1482, 1486 (9th Cir. 1993).

*AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586 (9th Cir. 1996), is not to the contrary. There, AT&T claimed that Compagnie Bruxelles Lambert was liable under CERCLA because its subsidiary operated a site from which hazardous substances were released. *Id.* at 590-91. We held that there was no specific jurisdiction over the parent company because (1) the parent company had insufficient independent contacts with the United States to establish personal jurisdiction, and (2) the subsidiary was not acting as the parent company's alter ego. *Id.* Here, Teck has sufficient *independent* personal contacts with the forum state to justify specific personal jurisdiction.

Teck here based on its allegedly tortious act aimed at the state of Washington, the first *Palmer* benchmark is satisfied, and we can appropriately construe the term "any person" to apply to Teck.

[7] The second *Palmer* benchmark is that the legislature must intend for the statute to apply to the situation. Except for the statutory definition of "any person," CERCLA is silent about *who* is covered by the Act. But CERCLA is clear about what is covered by the Act. CERCLA liability attaches upon release or threatened release of a hazardous substance into the environment. CERCLA defines "environment" to include "any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air *within the United States or under the jurisdiction of the United States*." § 9601(8) (emphasis added). CERCLA's purpose is to promote the cleanup of hazardous waste sites where there is a release or threatened release of hazardous substances into the environment within the United States. *See ARC Ecology v. U.S. Dep't of the Air Force*, 411 F.3d 1092, 1096-98 (9th Cir. 2005) (citing legislative history demonstrating that Congress intended CERCLA to apply to cleanup hazardous waste sites in the United States). Because the legislature intended to hold parties responsible for hazardous waste sites that release or threaten release of hazardous substances into the United States environment, the second *Palmer* benchmark is satisfied here.

Although the *Palmer* analysis supports the proposition that CERCLA applies to Teck, *Palmer* of course does not address the distinction between domestic or extraterritorial application of CERCLA. The *Palmer* analysis, however, in what we have termed its second benchmark, brings to mind the "domestic effects" exception to the presumption against extraterritorial application of United States law. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 287-88 (1952) (finding jurisdiction in a trademark suit against a person in Mexico who manufactured counterfeit Bulova watches that then entered and caused harm

within the United States). The difference between a domestic application of United States law and a presumptively impermissible extraterritorial application of United States law becomes apparent when we consider the conduct that the law prohibits. In *Steele* the prohibited conduct, the unauthorized use and reproduction of Bulova's registered trademark, took place in Mexico but the harm, the dilution of Bulova's trademark, took place in the United States. *Id.* at 287. The Court therefore held that there was jurisdiction in that case.

Here, the operative event creating a liability under CERCLA is the release or threatened release of a hazardous substance. *See* § 9607(a)(4). Arranging for disposal of such substances, in and of itself, does not trigger CERCLA liability, nor does actual disposal of hazardous substances.[17] A release must occur or be threatened before CERCLA is triggered. A party that "arranged for disposal" of a hazardous substance under § 9607(a)(3) does not become liable under CERCLA until there is an actual or threatened release of that substance into the environment. Arranging for disposal of hazardous substances, in itself, is neither regulated under nor prohibited by CERCLA. Further, disposal activities that were legal when conducted can nevertheless give rise to liability under § 9607(a)(3) if there is an actual or threatened release of such hazardous substances into the environment. *See Cad-*

---

[17]The terms "disposal" and "release" are each defined in CERCLA. "Disposal" is defined by reference to RCRA § 6903(3), which defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." § 9601(22). "[F]rom these definitions, we can conclude that 'release' is broader than 'disposal,' because the definition of 'release' includes 'disposing' (also, it includes 'passive' terms such as 'leaching' and 'escaping,' which are not included in the definition of 'disposal')." *Carson Harbor Vill.,* 270 F.3d at 878.

*illac Fairview/California, Inc. v. United States* (*Cadillac Fairview/California I)*, 41 F.3d 562, 565-66 (9th Cir. 1994) (holding that a party that sold a product to another party "arranged for disposal" of a hazardous substance); *Cadillac Fairview/California, Inc. v. Dow Chem. Co. (Cadillac Fairview/California II)*, 299 F.3d 1019, 1029 (9th Cir. 2002) (characterizing the conduct at issue in *Cadillac Fairview/ California I* as "legal at the time").

**[8]** The location where a party arranged for disposal or disposed of hazardous substances is not controlling for purposes of assessing whether CERCLA is being applied extraterritorially, because CERCLA imposes liability for releases or threatened releases of hazardous substances, and not merely for disposal or arranging for disposal of such substances.[18] Because the actual or threatened release of hazardous substances triggers CERCLA liability, and because the actual or threatened release here, the leaching of hazardous substances from slag that settled at the Site, took place in the United States, this case involves a domestic application of CERCLA.

Our conclusion is reinforced by considering CERCLA's

---

[18]CERCLA is a strict liability statute, and liability can attach even when the generator has no idea how its waste came to be located at the facility from which there was a release. *See O'Neil v. Picillo*, 883 F.2d 176, 183 & n.9 (1st Cir. 1989). The three statutory defenses enumerated in § 9607(b), including defenses for "an act of God," "an act of war," or "an act or omission of a third party other than an employee or agent of the defendant," are "the only [defenses] available, and . . . the traditional equitable defenses are not." *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 672 (9th Cir. 2004). There is no requirement that the generator of hazardous substances intend that the waste come to be located at a CERCLA facility. "In the case of an actual release, the plaintiff need only prove that the defendant's hazardous materials were deposited at the site, that there was a release at the site, and that the release caused it to incur response costs." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1186 (C.D. Cal. 2003) *aff'd sub nom. Carson Harbor Vill., Ltd. v. County of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006).

place within the constellation of our country's environmental laws, and contrasting it with RCRA:

> Unlike [CERCLA], RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards. RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, "so as to minimize the present and future threat to human health and the environment."

*Meghrig*, 516 U.S. at 483 (quoting § 6902(b)) (internal citation omitted). RCRA regulates the generation and disposal of hazardous waste, whereas CERCLA imposes liability to clean up a site when there are actual or threatened releases of hazardous substances into the environment. It is RCRA, not CERCLA, that governs prospectively how generators of hazardous substances should dispose of those substances, and it is the Canadian equivalent of RCRA, not CERCLA, that regulates how Teck disposes of its waste within Canada.

Here, the district court assumed, but did not decide, that this suit involved extraterritorial application of CERCLA because "[t]o find there is not an extraterritorial application of CERCLA in this case would require reliance on a legal fiction that the 'releases' of hazardous substances into the Upper Columbia River Site and Lake Roosevelt are wholly separable from the discharge of those substances into the Columbia River at the Trail Smelter." However, what the district court dismissed as a "legal fiction" is the foundation of the distinction between RCRA and CERCLA. If the Trail Smelter were in the United States, the discharge of slag from the smelter into the Columbia River would potentially be regulated by RCRA and the Clean Water Act. And that prospective regulation, if any, would be legally distinct from a finding of CER-

CLA liability for cleanup of actual or threatened releases of the hazardous substances into the environment from the disposal site, here the Upper Columbia River Site. That the Trail Smelter is located in Canada does not change this analysis, as the district court recognized.

CERCLA is only concerned with imposing liability for cleanup of hazardous waste disposal sites where there has been an actual or threatened release of hazardous substances into the environment. CERCLA does not obligate parties (either foreign or domestic) liable for cleanup costs to cease the disposal activities such as those that made them liable for cleanup costs; regulating disposal activities is in the domain of RCRA or other regulatory statutes.

[9] We hold that applying CERCLA here to the release of hazardous substances at the Site is a domestic, rather than an extraterritorial application of CERCLA, even though the original source of the hazardous substances is located in a foreign country.

## V

We next address Teck's only other argument—that it is not covered by § 9607(a)(3) because it has not "arranged for disposal . . . of hazardous substances . . . by any other party or entity" because, if the facts in the complaint are taken as true, Teck disposed of the slag itself. Preliminarily, we note that neither Pakootas, nor the Order, specifically allege that Teck is an arranger under § 9607(a)(3). Rather, the Order states that Teck is a "responsible party under Sections 104, 107, and 122 of CERCLA, 42 U.S.C. §§ 9604, 9607, and 9622." UAO at 6. The parties have, however, focused in their arguments solely on § 9607(a)(3).[19]

---

[19]The parties have not briefed or argued whether Teck may be liable under § 9607(a)(1), (2), or (4). We accordingly express no opinion on whether Teck may be liable under these subsections.

**[10]** Section 9607(a)(3) holds liable parties that arranged for the disposal of hazardous substances. It states, in relevant part, the following:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for the transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such substances . . . shall be liable for . . .

certain costs of cleanup. § 9607(a)(3). We have previously said that "neither a logician nor a grammarian will find comfort in the world of CERCLA," *Carson Harbor Vill.*, 270 F.3d at 883, a statement that applies with force to § 9607(a)(3). Section 9607(a)(3) does not make literal or grammatical sense as written. It is by no means clear to what the phrase "by any other party or entity" refers. Pakootas argues that it refers to a party who owns the waste; and Teck argues that it refers to a party who arranges for disposal with the owner. To make sense of the sentence we might read the word "or" into the section, which supports Pakootas's position, or we might delete two commas, which supports Teck's position. Neither construction is entirely felicitous.

Section 9607(a)(3)'s phrase "by any other party or entity" can be read to refer to "hazardous substances owned or possessed by such person," such that parties can be liable if they arranged for disposal of their own waste or if they arranged for disposal of wastes owned "by any other party or entity." This would mean that a party need not own the waste to be liable as an arranger. But it would require reading the word "or" into the provision, so that the relevant language would read "any person who . . . arranged for disposal or treatment . . . of hazardous substances **owned** or possessed **by such person [or] by any other party or entity** . . . ." We followed this

approach in *Cadillac Fairview/California I*, where we said with forcible reasoning:

> Liability is not limited to those who own the hazardous substances, who actually dispose of or treat such substances, or who control the disposal or treatment process. The language explicitly extends liability to persons "otherwise arrang[ing]" for disposal or treatment of hazardous substances whether owned by the arranger or "by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity."

41 F.3d at 565 (quoting § 9607(a)(3)) (alteration in original); *see also Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 659 (6th Cir. 2000) (holding that defendant was potentially liable as an arranger when it discharged hazardous substances into a river).

The text of § 9607(a)(3) can also be modified to support a different meaning, the one that Teck advances on this appeal. Teck argues that the phrase "by any other party or entity" refers to "or otherwise arranged for disposal or treatment," and so, the argument runs, arranger liability does not attach unless one party arranged with another party to dispose of hazardous substances. If we accept this position, then a generator of hazardous substances who disposes of the waste alone and with no other participant may defeat CERCLA liability, because the generator had not "arranged" with a second party for disposal of the waste. But this interpretation would appear to require the removal of the two commas that offset the phrase "by any other party or entity," so that the relevant language would read "any person who . . . **arranged for disposal** or treatment . . . of hazardous substances owned or possessed by such person[ ] **by any other party or entity**[ ]." In *Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.*, 976 F.2d 1338 (9th Cir. 1992) we perhaps implicitly, albeit summarily, suggested that this reading might be

appropriate, stating: "Nor has [Plaintiff] alleged that [Defendant] Ferry arranged for the contaminated soil to be disposed of 'by any other party or entity' under 9607(a)(3). Ferry disposed of the soil itself by spreading it over the uncontaminated areas of the property." *Id.* at 1341; *see also Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 24 (1st Cir. 2004) ("The clause 'by any other party or entity' clarifies that, for arranger liability to attach, the disposal or treatment must be performed by another party or entity, as was the case here."). Thus it can be argued that an implication from *Kaiser Aluminum* supports Teck's view.

Teck's argument relying on implication from *Kaiser Aluminum* would create a gap in the CERCLA liability regime by allowing a generator of hazardous substances potentially to avoid liability by disposing of wastes without involving a transporter as an intermediary. If the generator disposed of the waste on the property of another, one could argue that the generator would not be liable under § 9607(a)(1) or (a)(2) because both subsections apply to the owner of a facility; as we described above the relevant facility is the site at which hazardous substances are released into the environment, not necessarily where the waste generation and dumping took place. Liability as a transporter under § 9607(a)(4) might not attach because transporter liability applies to "any person who accepts or accepted any hazardous substance for transport." Although we do not here decide the contours of transporter liability, one could argue that a generator who owns hazardous substances cannot "accept" such hazardous substances for transport because they are already held by the generator. We hesitate to endorse a statutory interpretation that would leave a gaping and illogical hole in the statute's coverage, permitting argument that generators of hazardous waste might freely dispose of it themselves and stay outside the statute's cleanup liability provisions. We think that was not what was intended by Congress's chosen language and statutory scheme.

**[11]** The ambiguous phrase "by any other party or entity" cannot sensibly be read to refer both to the language urged by

Pakootas and to that urged by Teck in their differing theories of statutory interpretation. In interpreting the turbid phrase and punctuation on which the parties have vigorously pressed contradictory theories, we necessarily navigate a quagmire. Yet, in the face of statutory ambiguity, § 9607(a)(3) "must be given 'a liberal judicial interpretation . . . consistent with CERCLA's overwhelmingly remedial statutory scheme.' " *Cadillac Fairview/California I*, 41 F.3d at 565 n.4 (quoting *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1380 (8th Cir. 1989) (alteration in original)).

Pakootas and the State of Washington suggest that we can resolve the inconsistent and mutually-exclusive language in *Cadillac Fairview/California I* and *Kaiser Aluminum* by dismissing as ambiguous or as dicta the statement in *Kaiser Aluminum* that "[n]or has [Plaintiff] alleged that Ferry arranged for the contaminated soil to be disposed of 'by any other party or entity' under 9607(a)(3)." 976 F.2d at 1341. The argument is that it is unclear whether we meant in *Kaiser Aluminum* that we did not need to reach the question because Plaintiff had not alleged that Ferry was an arranger, or instead that Plaintiff had alleged that Ferry was an arranger but that we rejected that interpretation.

We conclude that Pakootas and the State of Washington are correct. The two sentences from *Kaiser Aluminum* quoted above are the only two sentences in that opinion to discuss arranger liability. The opinion contains no analysis of the text of § 9607(a)(3), and does not discuss arguments for or against interpreting § 9607(a)(3) to require the involvement of another party or entity for arranger liability to attach. The ambiguous discussion of § 9607(a)(3) liability was not in our view a holding, but rather a prelude to discussing why the defendant in *Kaiser Aluminum* was potentially liable as an owner of a facility under § 9607(a)(2) or as a transporter under § 9607(a)(4). And perhaps most importantly, the statement in question may be simply a description of what was not

alleged by a party, rather than our court's choice of a rule of law.

Further, the statement in *Kaiser Aluminum* bears the hallmarks of dicta. *See United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) (en banc) (Kozinski, J., concurring) ("Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case.").[20]

**[12]** Because we view the statement in *Kaiser Aluminum* as offhand, unreasoned, and ambiguous, rather than as an intended choice of a rule, we consider the Ninth Circuit's law to be represented by *Cadillac Fairview/California I*. And under *Cadillac Fairview/California I*, the phrase "by any other party or entity" refers to ownership of the waste, such that one may be liable under § 9607(a)(3) if they arrange for disposal of their own waste or someone else's waste, and that the arranger element can be met when disposal is not arranged "by any other party or entity." We hold instead that Teck is potentially liable under § 9607(a)(3), and we reject Teck's argument that it is not liable under § 9607(a)(3) because it did not arrange for disposal of its slag with "any other party or entity."

---

[20]Moreover, a characterization of the statement in *Kaiser Aluminum* as a dictum, or as merely reflecting the absence of an allegation by the plaintiff, is consistent with our preexisting circuit authority, not addressed in *Kaiser Aluminum*, which had suggested that a generator could be liable under § 9607(a)(3) even if a second party was not involved. *See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1156 (9th Cir. 1989) (reversing the district court's dismissal of Ascon's complaint for failure to state a claim because Ascon alleged that "the eleven oil company defendants and four transporter defendants deposited hazardous waste onto the property").

## VI

**[13]** In conclusion, we hold that the district court correctly denied Teck's motion to dismiss Pakootas's complaint for failure to state a claim, and reject Teck's arguments to the contrary. Applying CERCLA to the Site, as defined by the Order issued by the EPA, is a domestic application of CERCLA. The argument that this case presents an extraterritorial application of CERCLA fails because CERCLA liability does not attach until there is an actual or threatened release of hazardous substances into the environment; the suit concerns actual or threatened releases of heavy metals and other hazardous substances into the Upper Columbia River Site within the United States. We reject Teck's argument that it is not liable under § 9607(a)(3) because it did not arrange for disposal of hazardous substances "by any other party or entity."

**AFFIRMED.**